IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-67-FL

| | | |
|---|---|---|
| U.S. MED SUPPLIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GERI-CARE PHARMACEUTICALS, | ) | ORDER |
| CORP; GERI-CARE PHARMECUTICAL | ) | |
| SUPPLY CO., LLC; and RAKAA | ) | |
| MEDICAL CO. LTD., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the following motions:

1)    Motion for summary judgment by defendants Geri-Care Pharmaceuticals, Corp, and Geri-Care Pharmaceutical Supply Co., LLC (together, the "Geri-Care defendants" or "Geri-Care") (DE 61).

2)    Plaintiff's partial motion for summary judgment as to its claims against the Geri-Care defendants for breach of contract, fraud/intentional misrepresentation, and violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") (DE 65).

3)    Motion to set aside default by defendant Rakaa Medical Co. Ltd. ("Rakaa") (DE 93).

4)    Motion to permit admissions to be withdrawn and/or amended by defendant Rakaa (DE 98).

These motions have been briefed fully, and in this posture the issues raised are ripe for ruling.

## STATEMENT OF THE CASE

Plaintiff commenced this action in Wake County Superior Court on January 23, 2020, arising out of a disputed business relationship with defendants for distribution of pharmaceutical products to Saudi Arabia. Plaintiff asserts the following claims: 1) breach of contract, 2) fraud/intentional misrepresentation, 3) constructive fraud, 4) breach of fiduciary duty and duty of good faith and fair dealing, 5) tortious interference with contract, and 6) violation of the UDTPA. Plaintiff seeks compensatory, punitive, and trebled damages, as well as costs and fees.

Because of the nature of the motions filed by defendant Rakaa, the court sets forth as follows a detailed procedural history of this case. The Geri-Care defendants removed the case to this court on February 21, 2020. Shortly thereafter, it moved to dismiss the action for lack of personal jurisdiction. Plaintiff responded in opposition and moved in the alternative to transfer venue to the United States District Court for the Eastern District of New York. In the time period prior to reassignment of this case to the undersigned district judge,[1] the court denied the Geri-Care defendants' motion to dismiss and plaintiff's alternative motion to transfer venue. See U.S. Med Supplies, LLC v. Geri-Care Pharms., Corp., No. 5:20-CV-67-D, 2020 WL 6293666 (E.D.N.C. Oct. 27, 2020) (DE 20).

The Geri-Care defendants answered the complaint, and the clerk noticed plaintiff of failure to make service within 90 days regarding defendant Rakaa. Shortly thereafter, plaintiff filed a motion for extension of time to serve defendant Rakaa and for the court's approval of service method as to defendant Rakaa. The court allowed plaintiff's motion, on December 16, 2020, specifically ordering plaintiff to make service upon defendant Raaka, pursuant to Federal Rule of

---

[1] This matter was reassigned to the undersigned, at the direction of the court, on September 14, 2021.

Civil Procedure 4(f)(3), by certified mail, Federal Express, and email. (December 16, 2020, Order (DE 26) at 1-3). The court entered an initial scheduling order January 11, 2021, setting a discovery deadline for February 18, 2022.

Plaintiff filed an affidavit of service as to defendant Rakaa on January 18, 2021, relying upon proofs of delivery. The Geri-Care defendants amended their answer, June 29, 2021, asserting a statute of limitations defense. Thereafter, this matter was reassigned to the undersigned district judge, and the court entered an amended case management order setting a deadline of January 15, 2022, for discovery and March 18, 2022, for dispositive motions, subsequently extended to April 1, 2022. Following a period of discovery, plaintiff and the Geri-Care defendants filed the instant cross motions for summary judgment.

In support of their motion, the Geri-Care defendants rely upon a statement of material facts and exhibits comprising the following: 1) declarations of their employees, Martin Friedman ("Friedman"), Nathan Rosenberg ("Rosenberg"), and Ralph Chill ("Chill"); 2) deposition testimony by plaintiff's managing owner, Raja Husein ("Husein"); 3) correspondence between the Geri-Care defendants and plaintiff; 4) correspondence between plaintiff and defendant Rakaa; 5) correspondence between the Geri-Care defendants and the Saudi Arabian Ministry of Health; 6) invoices for shipment of Geri-Care defendants' products to defendant Rakaa and non-parties Health Stream LLC and Pharmamed Global Distributors; and 7) the pleadings.

In support of its motion, in addition to documents relied upon by the Geri-Care defendants, plaintiff relies upon a statement of material facts and exhibits comprising: 1) excerpts of depositions of Friedman, Rosenberg, Chill, and Husein; 2) a "Quotation" executed by defendant Rakaa for supply of Geri-Care defendants' product; 3) additional correspondence between Geri-Care defendants and plaintiff; 4) additional shipment documents and invoices involving Geri-Care

defendants' products; 5) correspondence between defendant Rakaa and non-parties, including S.S. Sampliner & Co., Inc. and Pharmamed Global Distributors; 6) Geri-Care defendants' responses to interrogatories; 7) additional correspondence from Geri-Care defendants regarding shipment of products to Saudi Arabia; 8) charts and tables of damages, purchases, and sales; 9) plaintiff's request for admissions served on defendant Rakaa and notice of deposition on Geri-Care defendants; 10) affidavit by Husein; and 11) an account statement by plaintiff to defendant Rakaa.

The Geri-Care defendants responded in opposition to plaintiff's motion and statement of facts, relying upon a second declaration by Rosenberg.  Plaintiff responded to the Geri-Care defendants' motion, and then plaintiff replied in support of its own motion, relying upon deposition testimony of Ehtesham Khokhar, a former director of non-party, Health Stream, LLC.  The Geri-care defendants replied in support of their motion, relying upon a third declaration by Rosenberg.

In the meantime, on April 19, 2022, upon plaintiff's motion, the clerk entered default against defendant Rakaa.  After the instant summary judgment motions had been submitted to the court for decision, counsel entered an appearance on behalf of defendant Rakaa June 30, 2022, and filed the motion to set aside default with reliance upon declaration of counsel.  Plaintiff's opposition to that motion is predicated upon 1) correspondence between counsel for plaintiff and defendant Rakaa; 2) correspondence between the court and defendant Rakaa; and 3) filings in a previous case in Wake County Superior Court captioned Rakaa Medical Co., Ltd. v. US Med Supplies, LLC, No. 17-CVS-9785 (the "prior action").  Defendant Rakaa then filed the instant motion to permit admissions to be withdrawn and/or amended which motion is opposed with reliance upon declaration of counsel and documents regarding service of discovery on this defendant.

4

## STATEMENT OF UNDISPUTED FACTS

Plaintiff "is a Raleigh based international distributor (not manufacturer) of pharmaceutical products." (Pl's Stmt. (DE 67) ¶1).[2] "Husein is the owner of [plaintiff], and is knowledgeable with regard to all aspects of [its] operations, financial and otherwise." (Id. ¶ 94).

"The Geri-Care defendants . . . consist of [two] affiliated companies located in New York, and New Jersey," who manufacture "pharmaceutical products, including . . . calcium carbonate,"[3] the product relevant to the claims in this case. (Id. ¶ 2). The Geri-Care defendants' "pharmaceutical sales are primarily in the [United States], with some international sales, including the pharmaceutical products related to this case." (Id.). Rosenberg is a vice president of sales for the Geri-Care defendants. (Id. ¶ 17).

Rakaa "is a Saudi Arabian distributor (not manufacturer) of pharmaceutical products, located in Riyadh, Kingdom of Saudi Arabia." (Id. ¶2). "Rakaa primarily solicits supply of pharmaceuticals to the Saudi Arabian Ministry of Health ('SAMH'), which secures pharmaceutical

---

[2] Pursuant to Local Rule 56.1(a)(2), the court cites to paragraphs in the parties' respective statements of material facts where not "specifically controverted by a correspondingly numbered paragraph in [an] opposing statement." Plaintiff argues that a large number of paragraphs in its statement of material fact should be deemed admitted because the Geri-Care defendants fail to include "citation[s] to evidence" in its opposing statement, "identify[ing] with specificity the relevant page and paragraph or line number of the evidence cited." Local Rule 56.1(a)(4). The court disagrees. A paragraph will be deemed admitted under the rule only where it is not "specifically controverted by a correspondingly numbered paragraph in the opposing statement." Local Rule 56.1(a)(2). While the Geri-Care defendants' opposing statement fails to include in some instances citations required by Local Rule 56.1(a)(4), it nonetheless contains numbered paragraphs "specifically controvert[ing]" paragraphs in plaintiff's statement, as required by Local Rule 56.1(a)(2). Accordingly, the omission of citations does not result in deeming paragraphs in plaintiff's statement admitted under Local Rule 56.1(a)(2). Instead, these omissions reduce the utility and persuasive force of the opposing statement. At the same time, these omissions may be partly excused under the circumstances of this case where the Geri-Care defendants filed their own statement of material facts that itself contains citations to evidence. (See Defs' Stmt. of Facts (DE 63)).

[3] According to the United States National Institutes of Health, National Library of Medicine, "Calcium Carbonate is the carbonic salt of calcium (CaCO3), which is "used therapeutically as a phosphate buffer in hemodialysis, as an antacid in gastric hyperacidity for temporary relief of indigestion and heartburn, and as a calcium supplement for preventing and treating osteoporosis." (See https://pubchem.ncbi.nlm.nih.gov/compound/Calcium-carbonate).

supplies for the Saudi network of government run hospitals." (Id.). Rakaa is authorized in Saudi Arabia to bid on "request[s] for pricing ('RFP')" from the Saudi Arabian Ministry of Health. (Defs' Stmt. (DE 63) ¶ 7). Plaintiff is not authorized to bid directly on such requests for pricing from the Saudi Arabian Ministry of Health. (Id. ¶ 8).

On November 13, 2014, plaintiff and defendant Rakaa entered into a "Memorandum of Understanding," whereby the parties agreed "to cooperate together and draw up a joint solid business plan for introducing, promoting and marketing the products of the [plaintiff] to all targeted medical and health sectors in [Saudi Arabia] including without limitation, Ministry of Health, its affiliate sectors, [and] independent central hospitals." (DE 68-28 at 1). The parties to the Memorandum of Understanding committed "to respect exclusivity for the products to be supplied by [plaintiff], which means that [plaintiff] shall not enter in any agreement or make offer to any other companies in the territory other than [defendant Rakaa]." (Id. at 2). Thus, "[p]ursuant to the [Memorandum of Understanding], [p]laintiff could only do business in Saudi Arabia through [d]efendant Rakaa." (Defs' Stmt. (DE 63) ¶ 11).

"In February 2015, Rakaa notified [p]laintiff about [a] certain [request for pricing] for pharmaceuticals." (Id. ¶ 12). "One of those pharmaceuticals mentioned in the [request for pricing] was for a large quantity exceeding 84 million pills of calcium carbonate 600mg." (Id. ¶ 13).

An undated "quotation," captioned "NUPCO NPT 0001/15 Tender," with a "company stamp" by defendant Rakaa, describes a quantity of 89,820,696 calcium carbonate 600 mg tablets, manufactured by Geri-Care, originating in the United States, with 1,000 tablets per pack, to be supplied by defendant Rakaa at a unit price and total price in "SR," as well as a "unit price in writing," in Arabic script. (Pl's Ex. 10 (DE 68-10)).

"At no time from February 2015 until August 30, 2015 did Husein tell anyone at Geri-Care that [p]laintiff was awarded a purchase order from Rakaa." (Defs' Stmt. (DE 63) ¶ 16). "As of September 1, 2015, Husein did not have a written purchase order from defendant Rakaa." (Id. ¶ 18). Rather, "Husein only had an oral confirmation from defendant Rakaa about a pending purchase order." (Id. ¶ 19). "Plaintiff would not enter into a supply contract with Geri-Care without first having a written purchase order from defendant Rakaa." (Id. ¶ 20). "Plaintiff never got a written purchase order from Rakaa." (Id. ¶ 21).

"On August 31 or September 1, 2015, Husein asked Rosenberg to draft a letter addressed to 'to whom it may concern.'" (Id. ¶ 22). This letter, (hereinafter the "first letter"), which was signed on Geri-Care letterhead by Rosenberg, September 1, 2015, provides as follows:

This letter is to confirm that US Med Supplies located at 3928 Morvan Way, Raleigh, NC 27612 is an authorized distributor of products manufactured by Gericare Pharmaceuticals Corp. located at 1650 63rd Steet, Brooklyn, NY 11204. Gericare will contract manfacture Calcium Carbonate 600 mg (National Brand Equivalent; Caltrate) in 60 count bottles for US Med Supplies for exclusive export to Saudi Arabia.

All sales of Gericare Calcium Carbonate to Saudi Arabia will be handled by US Med Supplies or one of its affiliates.

(Pl's Ex. 3 (DE 68-3)).

On September 9, 2015, at 10:31 a.m., Husein, on behalf of plaintiff, emailed Rosenberg, at Geri-Care, stating as follows, with reference to the first letter:

**Subject:** Agency Letter & Supply Contract

Dear [Rosenberg],

Sorry but the ministry of health rejected the letter. Please revise as stated below to conform with their requirement to issue the import permit for our order. Please email the revised letter below asap. We also need you to sign a supply contract. I am in Saudi Arabia now finalizing this deal.

7

"This letter is to confirm that Gericare Pharmaceuticals Corp located at <u>1650 63rd Street Brooklyn NY 11204,</u> has a contract with US Med Supplies located at <u>3928 Morvan Way, Raleigh NC 27612</u> to manufacture Calcium Carbonate 600mg (National Brand Equivalent Caltrate) and US Med Supplies is the exclusive and sole agent for export to Saudi Arabia. All sales of Gericare Pharmaceuticals products to Saudi Arabia will be handled by US Med Supplies, or one of its affiliates."

(Pl's Ex. 31 (DE 68-31) at 1-2). "At no time did Husein ever speak with anyone at the Saudi Arabian Ministry of Health." (Defs' Stmt. (DE 63) ¶ 26).

Rosenberg responded nine minutes later to Husein, stating:

Can I put this in: (note end of sentence)

All sales of Gericare Pharmaceuticals products to Saudi Arabia will be handled by US Med Supplies, or one of its affiliates for the period of oneyear, beginning [sic] September 1, 2015 and can be renewed on a yearly basis.

(Pl's Ex. 31 at 1).

That same day, Rosenberg executed the following letter "to whom it may concern" (hereinafter the "second letter"):

To Whom It May Concern,
This letter is to confirm that Gericare Pharmaceuticals Corp located at <u>1650 63rd Street Brooklyn NY 11204</u> has a contract with US Med Supplies located at <u>3928 Morvan Way, Raleigh NC 27612</u> to manufacture Calcium Carbonate 600mg (National Brand Equivalent Caltrate) and US Med Supplies is the exclusive and sole agent for export to Saudi Arabia.

All sales of Calcium Carbonate manufactured by Gericare Pharmaceuticals intended for sale in Saudi Arabia will be handled by US Med Supplies, or one of its affiliates for the period of one year, beginning September 1, 2015 and can be renewed on a yearly basis."

(Pl's Ex. 4 (DE 68-4)).[4]   The Geri-Care defendants' chief executive officer, Eli Schindler ("Schindler"), and vice president of sales, Friedman, both "approved of the content of" the first letter and the second letter.   (Pl's Stmt. (DE 67) ¶17(d)).   "Rosenberg intended for the

---

[4]      Although the second letter is dated "9/01/2015" the parties do not dispute that it was executed by Rosenberg on September 9, 2015.

representations in the [Geri-Care defendants'] letters to [plaintiff] to be truthful." (Id. ¶18). "Husein believed if Geri-Care signed either letter . . . it would prohibit Geri-Care from selling calcium carbonate 600 mg to anyone who would re-sell the same to Saudi Arabia." (Defs' Stmt. (DE 63) ¶ 57).

An email sent later that day, at 7:45 p.m., from Husein to defendant Rakaa states: "Regarding Calcium Carbonate, we are unable to match your target price." (Def's Ex. F (DE 62-6 at 2). This statement is followed by further explanation by Husein referencing, among other things, "this order," "discounts," "pack size," "original quotation," "profit margin," and "preliminary awardation." (Id. at 2-3).

After receiving the second letter from Rosenberg, "Husein never showed [it] to anyone." (Defs' Stmt. (DE 63) ¶ 48). "Plaintiff never bought any calcium carbonate 600 mg from Geri-Care in the year 2015 or 2016." (Id. ¶ 60).

On September 24, 2015, defendant entered into a contract with Health Stream, LLC, providing for the Geri-Care defendants to "manufacture a minimum of 56,000,000 tablets of Calcium tablets [sic] 600 mg and bottled in 60 count bottles," and providing that the "price per bottle will be 64 cents USA currency," with manufacturing to start in September, 2015, with Health Stream, LLC to pay a starting deposit of $100,000.00 on September 25, 2015, and to make subsequent payments of $182,000.00, $132,000.00, and $162,000.00. (Pl's Ex. 12 (DE 68-12)). The Geri-Care defendants subsequently sent to Health Stream, LLC, invoices on six separate dates between October 15, 2015, and February 17, 2016, for payment for quantities of calcium carbonate shipped to Health Stream, LLC. (Pl's Ex. 13 (DE 68-13)).

Meanwhile, on October 15, 2015, an attorney representing plaintiff sent a letter to Schindler, copying Rosenberg and Friedman, at Geri-Care, seeking "adequate assurance of

performance" in reference to the second letter. (Pl's Ex. 14 (DE 68-14) at 1) (the "attorney letter"). Specifically, the attorney letter quotes language from the second letter stating that plaintiff is the "exclusive and sole" agent "for export to Saudi Arabia" of calcium carbonate 600 mg, which it references as the "Contract." (Id.). It further states that "there is sufficient reason to believe the [Saudi] distributor will be contacting your company directly in order to avoid making the purchase through [plaintiff]," and plaintiff asked for "assurance that Geri-Care will not breach the Contract." (Id.). Plaintiff requests "timely written assurances within 7 business days of receipt." (Id. at 2). The Geri-Care defendants did not respond to the attorney letter.

Plaintiff also sent the Geri-Care defendants an email on December 4, 2015, seeking a price quote for calcium carbonate. Rosenberg responded "I need to know where it's ending up before I quote." (Pl's Ex. 16 (DE 68-16) at 1). Plaintiff replied, "It's going to our exclusive territory (Saudi Arabia)." (Id.). The Geri-Care defendants did not respond further to that inquiry.

The Geri-Care defendants also "negotiated a relationship with another U.S. pharmaceutical distributor, PharmaMed ('PM'), for the delivery of 600 mg [Geri-Care calcium carbonate] 60 count bottles." (Pl's Stmt. (DE 67) ¶ 55; Def's Resp. (DE 75) ¶ 55). The Geri-Care defendants "supplied 883,333 bottles of [Geri-Care calcium carbonate] to PM during the period February 16, 2017, through July 28, 2017." (Pl's Stmt. (DE 67) ¶ 56).

Plaintiff "then assisted a Saudi Arabian distributor other than [defendant] Rakaa to win [a 2017 Saudi Arabian Ministry of Health] tender." (Id. ¶ 91). "In 2018, through a Saudi Arabian distributor other than Rakaa [plaintiff] won the bid for [a 2017 Saudi Arabian Ministry of Health] tender for [Geri-Care calcium carbonate] products to Saudi Arabia." (Id. ¶ 58). "That [calcium carbonate] product was supplied partially in 60-tab bottles, and partially in 150-tab bottles of [Geri-Care calcium carbonate] product beginning in March of 2018." (Id.). For that 2018 supply,

10

"[p]laintiff paid Geri-Care the contracted price for the calcium carbonate tablets and they were delivered on time." (Def's Stmt. (DE 63) ¶ 83).

## COURT'S DISCUSSION

A.    Motions for Summary Judgment

    1.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).[5]

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's]

---

[5]    In all citations in this order, internal quotations and citations are omitted unless otherwise specified.

favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

2.    Analysis

a.    Breach of Contract Claim

Plaintiff claims that the Geri-Care defendants breached their contractual obligations under the first and second letters by "violating [plaintiff's] exclusive distributorship rights to Saudi Arabia of calcium carbonate products," and that plaintiff should be entitled to damages including lost profits as a result. (Compl. ¶ 29; Pl's Mot. Sum. J. (DE 65) at 2). The Geri-Care defendants argue that summary judgment should be awarded in their favor because there were no such contractual obligations, there was no breach, plaintiff's claim is time barred, and lost profits are too speculative. For the reasons set forth below, there is a genuine issue of material fact only as to the elements of contract formation and breach based upon the second letter but not the first

12

letter. However, the claim in that part is time barred and plaintiff's claim for lost profits must be dismissed as a matter of law.

The elements of a breach of contract claim under North Carolina law are "the existence of a contract between plaintiff and defendant, the specific provisions breached, [t]he facts constituting the breach, and the amount of damages resulting to plaintiff from such breach." Cantrell v. Woodhill Enterprises, Inc., 273 N.C. 490, 497 (1968).

"For an agreement to constitute a valid contract, the parties minds must meet as to all the terms." Chappell v. Roth, 353 N.C. 690, 692 (2001). "If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement." Id. "To be binding, the terms of a contract must be definite and certain or capable of being made so." Horton v. Humble Oil & Refining Co., 255 N.C. 675, 679 (1961). "[I]t is necessary that the minds of the parties meet upon a definite proposition." Id. "There is no contract unless the parties thereto assent, and they must assent to the same thing, in the same sense." Id. Additionally, where a party seeks to enforce "[a] contract to enter into a future contract," that contract "must specify all its material and essential terms." Boyce v. McMahan, 285 N.C. 730, 734 (1974).

"Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." State v. Philip Morris USA Inc., 363 N.C. 623, 631 (2009). "It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." Carolina Power & Light Co. v. Bowman, 229 N.C. 682, 693-94 (1949). Terms in a contract are to be "interpreted according to their usual, ordinary, and commonly accepted meaning." Anderson v. Allstate Ins. Co., 266 N.C. 309, 312 (1966). "Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its

13

meaning and not what either party thought the agreement to be." Crockett v. First Fed. Sav. & Loan Ass'n, 289 N.C. 620, 631 (1976). "[A] contract is to be construed as a whole with each provision considered in the context of the entire contract." Lattimore v. Fisher's Food Shoppe, Inc., 313 N.C. 467, 473 (1985).

i.      Contract Formation and Breach

The Geri-Care defendants raise a threshold issue in their motion regarding whether the parties entered into an enforceable contract through either the first letter or the second letter, as plaintiff claims. As an initial matter, the first letter does not meet the requirements for formation of a contract under North Carolina law, because it states that "Gericare will contract" for manufacture of calcium carbonate "for [plaintiff] for exclusive export to Saudi Arabia." (Pl's Ex. 3 (DE 68-3)) (emphasis added). In this manner, the first letter references "a future contract," that does not "specify all its material and essential terms." Boyce, 285 N.C. at 734. Where this "portion of the proposed terms is not settled, [and] no mode agreed on by which they may be settled, there is no agreement." Id.

The first letter also is an incompletely formed agreement because it was followed, after further documented negotiations and agreement, by the second letter. In particular, Husein, on behalf of plaintiff, emailed to Rosenberg on September 9, 2015, proposed language for the second letter, requesting that he "revise" the first letter "as stated below" and to "email the revised letter below asap." (Pl's Ex. 31 (DE 68-31) at 1) (emphasis added). Rosenberg then suggested additional language to add to the second sentence of the text of the second letter proposed by Husein. Where Rosenberg subsequently executed the second letter on September 9, 2015, incorporating exactly the revised language that had been proposed by Husein, along with further revisions to the

14

additional language that Rosenberg had proposed, this demonstrates that the first letter was not then the parties' memorialized agreement.

In contrast to the first letter, the second letter when considered in combination with those negotiations and agreement, provides sufficient evidence of a completed contract. Viewing the facts in the light most favorable to plaintiff, there is a genuine issue of material fact that the parties entered into a contract, memorialized in the second letter, under which plaintiff "is the exclusive and sole agent for export to Saudi Arabia" of the Geri-Care defendants' calcium carbonate 600 mg product, and that "[a]ll sales" of that product by the Geri-Care defendants "intended for sale in Saudi Arabia will be handled by" plaintiff for the period of one year starting September 1, 2015. (Pl's Ex. 4 (DE 68-4)).

The Geri-Care defendants argue that there was no meeting of the minds in the second letter because "Geri-Care was told by Husein that <u>the letters were only meant to obtain import permits</u> and thus that is <u>the sole reason</u> Geri-Care issued them." (<u>Id.</u> at 12) (emphasis added). And, "Geri-Care would never [sign] an exclusive agency agreement without a purchase order or an executed supply agreement in hand." (<u>Id.</u>). These assertions are unavailing for two reasons. First, the language itself of the second letter says nothing about "import permits," a "purchase order," or an "executed supply agreement," and the court must construe the second letter according to its terms. <u>Carolina Power & Light Co.</u>, 229 N.C. at 694. Second, the Geri-Care defendants draw inferences in their favor from the communications preceding the second letter. Emails between Rosenberg and Husein prior to execution of the second letter do not state it is needed solely to obtain import permits or premised entirely on a purchase order in hand. (<u>See</u> Pl's Ex. 31 (DE 68-31) at 1). While these communications are open to interpretation, they do not preclude formation of a contract as a matter of law. Rather, viewed in the light most favorable to plaintiff, they suggest that the Geri-

15

Care defendants intended the second letter to memorialize an exclusive supply contract, given that Rosenberg himself suggested directly to plaintiff the addition of a time period for exclusivity. (See id.). [6]

The Geri-Care defendants also argue that there was no meeting of the minds because the second letter was addressed "to whom it may concern" and signed only by the Geri-Care defendants, and not plaintiff. However, the fact that it is addressed "to whom it may concern" reasonably could be construed to include plaintiff as one such party concerned. See, e.g., Bullock v. Bullock, 161 N.C. 387, 77 S.E. 300, 301 (1913) (holding that a letter addressed "to whom it may concern," although "very inartificially [sic] drawn," presented a genuine issue of contract formation). Similarly, a signature on behalf of the Geri-Care defendants, whom plaintiff seeks to bind, is sufficient also to create a genuine issue of contract formation. See Newbern v. Fisher, 198 N.C. 385, 151 S.E. 875, 876 (1930) (noting general rule of enforceability of contract "in writing and signed by the party charged therewith"); see, e.g., Radio Elecs. Co. v. Radio Corp. of Am., 244 N.C. 114, 117 (1956) (describing "a contract whereby a person, firm or corporation is made exclusive distributor for the State of North Carolina, precluding the manufacturer from doing business in North Carolina otherwise than through this single channel," where "the party so limited or restricted agrees thereto in writing").

The Geri-Care defendants contend there was no consideration on the part of plaintiff for what they characterize as an "offer" of an exclusivity agreement in the second letter. (Defs' Mem.

---

[6]     For the same reason, the court rejects the Geri-Care defendants' arguments that the reference to "a contract" between the parties in the second letter necessarily is a "mutual mistake" (Defs' Mem. (DE 62) at 13), or that there necessarily were conditions precedent written into the second letter, in that "before either party had to act, the Plaintiff had to win the bid . . . and then to actually order the calcium carbonate." (Id. at 17). Likewise, the court finds unavailing their argument that plaintiff fraudulently induced them into signing the second letter through Husein's representations about the existence of a contract with defendant Raja. Genuine issue of material fact preclude summary judgment in favor of the Geri-Care defendants on each of these issues. At the same time, such genuine issues of fact also preclude summary judgment on the question of contract formation in favor of plaintiff.

16

(DE 62) at 13). Consideration, however, "consists of some benefit or advantage to the promisor, or some loss or detriment to the promisee." <u>Penley v. Penley</u>, 314 N.C. 1, 14 (1985). "[T]here is consideration if the promisee, in return for the promise, does anything legal which he is not bound to do, or refrains from doing anything which he has a right to do, whether there is any actual loss or detriment to him or actual benefit to the promisor or not." <u>Id.</u> This standard is met here because, at the time of execution of the second letter, plaintiff had engaged in efforts to obtain a purchase order from defendant Rakaa for the Geri-Care defendants' product. (E.g., Pl's Ex. 31 (DE 68-31) at 1 ("I am in Saudi Arabia now finalizing this deal."); Pl's Ex. 1 (DE 68-1) at 3 (stating to defendant Rakaa, "[w]e worked very closely together to win this order" and describing negotiation efforts)). This was not something plaintiff was bound to do, and such evidence permits an inference of consideration for the promises in the second letter.

With respect to breach, there is also a genuine issue of material fact that the Geri-Care defendants breached this contract, as so construed, by selling calcium carbonate 600 mg product to Health Stream, LLC, intended for sale in Saudi Arabia in 2015 and 2016. While the Geri-Care defendants point to the fact that they did not "directly" export their products to Saudi Arabia, and their customers could ship products wherever they wanted to, there is sufficient evidence upon which to infer that shipments made to Health Stream LLC in 2015 and 2016 were "intended for sale in Saudi Arabia." (Second Letter, Pl's Ex. 4 (DE 68-4)).[7] For example, shortly after executing the second letter for exclusive sale of calcium carbonate 600mg tablets to Saudi Arabia, the Geri-Care defendants entered into a contract for supply of the same product to Health Stream LLC. (Pl's

---

[7]    This language in the second letter also is materially different from language in the first letter, which is an additional reason precluding plaintiff's claim based on the first letter. In particular, the first letter provides only that "[a]ll sales of Gericare Calcium Carbonate <u>to Saudi Arabia</u>" will be handled by plaintiff. (Pl's Ex. 3 (DE 68-3)). Plaintiff has not demonstrated a genuine issue of fact that the Geri-Care defendants made any sales of calcium carbonate to Saudi Arabia.

Ex. 12 (DE 68-12)). While the Health Stream LLC contract and later shipment invoices do not reference Saudi Arabia, Rosenberg stated to plaintiff in December 2015 that he "need[ed] to know where it's ending up before I quote" an order for calcium carbonate tablets. (Pl's Ex. 16 at 1). Thus, it is plausible to infer that the Geri-Care defendants' sales to Health Stream LLC in 2015 and 2016 were intended for sale in Saudi Arabia, in breach of the exclusivity agreement in the second letter.

In sum, plaintiff has demonstrated a genuine issue of material fact as to formation of a contract in the second letter, and breach thereof, on the terms set forth herein. Plaintiff's arguments in favor of a broader contractual obligation based on both the first letter and the second letter together, however, are not supported by the law or the record in this case. For example, plaintiff contends that "the content of both documents was truthful, and that both documents were intended and expected to be relied upon by [plaintiff]." (Pl's Mem. (DE 80) at 6). While the second letter supports these contentions, the first letter does not, given its open-ended terms, reference to a future contract, and circumstances under which Husein requested revision of the first letter and Rosenberg requested further additions, including a time limitation.

Accordingly, the Geri-Care defendants' motion is granted in that part where they seek summary judgment on the issue of contract formation and breach as to the first letter, and denied in that part where they seek summary judgment on those issues under the second letter. The court turns next to address statute of limitations as it pertains to plaintiff's claim relying upon the second letter.

ii.     Statute of Limitations

The Geri-Care defendants argue that plaintiff's breach of contract claim is barred by a three year statute of limitations. North Carolina General Statute § 1-52 requires an action "[u]pon a

18

contract, obligation or liability arising out of a contract, express or implied," to be brought "[w]ithin three years." N.C. Gen. Stat. § 1-52(1).[8] "A cause of action generally accrues and the statute of limitations begins to run as soon as the right to institute and maintain a suit arises." Penley, 314 N.C. at 20. "A cause of action does not accrue until a right which belongs to a person is invaded in some manner by another." MacDonald v. Univ. of N. Carolina at Chapel Hill, 299 N.C. 457, 463 (1980).

Thus, "[a] cause of action for a suit involving a breach of contract accrues as of the date of breach." Id. "The statute begins to run on the date the promise is broken." Penley, 314 N.C. at 20. "When the right of the party is once violated, even in ever so small a degree, the injury, in the technical acceptation of that term, at once springs into existence and the cause of action is complete." Pearce v. N. Carolina State Highway Patrol Voluntary Pledge Comm., 310 N.C. 445, 449 (1984). Further, "[a]s [the North Carolina Supreme Court] has stated on numerous occasions, a plaintiff's lack of knowledge concerning his claim does not postpone or suspend the running of the statute of limitations" on a breach of contract claim. Id. at 451.

Here, the first instance of breach, drawing inferences in plaintiff's favor, is the September 24, 2015, date that the Geri-Care defendants entered into a contract with Health Stream LLC for the sale of calcium carbonate 600mg tablets, intended for sale in Saudi Arabia. (Pl's Ex. 12 (DE 68-12). That is the date the breach of contract claim accrued and the date the statute of limitations began to run. MacDonald, 299 N.C. at 463; Penley, 314 N.C. at 20. At that point, "[w]hen the right of the [plaintiff was] once violated, even in ever so small a degree, the injury, in the technical acceptation of that term, at once [sprang] into existence and the cause of action [was] complete."

---

[8] The same limitations period and rules apply to plaintiff's claim for breach of good faith and fair dealing. See Ussery v. Branch Banking & Tr. Co., 368 N.C. 325, 333 n. 5 (2015). The Geri-Care defendants also raise statute of limitations as a defense to plaintiff's other tort claims, which claims the court addresses separately below, without addressing the Geri-Care defendants' statute of limitations arguments on those claims.

<u>Pearce</u>, 310 N.C. at 449.   The limitations period ran three years from that date, until September 24, 2018, and plaintiff's breach of contract claim was time barred for over a year when filed January 23, 2020.

Plaintiff nonetheless argues that the statute of limitations does "not accrue until the date of the discovery by [plaintiff] of the facts underlying the claim," citing N.C. Gen. Stat. § 1-52(16) and <u>McCarver v. Blythe</u>, 147 N.C. App. 496, 499 (2001). (Pl's Mem. (DE 80) at 24). Plaintiff contends it did not discover the Geri-Care defendants "had supplied Rakaa, initially through Health Stream, until January 26, 2017," when plaintiff was the inadvertent recipient of documents confirming such sales.  (<u>Id.</u> at 25; see Pl's Ex. 37 (DE 68-37)).  Thus, plaintiff suggests that the statute of limitations did not accrue until January 26, 2017, and did not expire until January 26, 2020, after plaintiff had filed its breach of contract claim.

Plaintiff's argument is unavailing, however, because the statute it cites does not address the limitations period for a breach of contract claim.  Rather, it provides an accrual rule for a cause of action "for personal injury or physical damage to claimant's property."  N.C. Gen. Stat. § 1-52(16).  Likewise, the cited case, <u>McCarver</u>, applies that same "discovery rule" in the event of "a cause of action for personal injury or physical property damage." <u>McCarver</u>, 147 N.C. App. at 499. Plaintiff's breach of contract claim is not a cause of action for personal injury or physical property damage.  Therefore, the "discovery" rule set forth in § 1-52(16) and <u>McCarver</u> is inapposite.

In addition, while the North Carolina Supreme Court has in some instances started the running of the limitations period from the time "the injury becomes apparent to the claimant or should reasonably become apparent," <u>Chisum v. Campagna</u>, 376 N.C. 680, 701 (2021),[9] there is

<hr/>

[9]     The North Carolina Supreme Court in <u>Chisum</u> opined that its prior opinions in <u>Pearce</u> and <u>Penley</u> were "somewhat opaque in addressing the issue" of accrual for "a plaintiff who has <u>no way of knowing</u> that the underlying breach has occurred." <u>Chisum</u>, 376 N.C. at 702 (emphasis added). For the reasons stated above, because of the time

no genuine issue of fact here under this alternative standard. Indeed, plaintiff's letter to the Geri-Care defendants, on October 15, 2015, stated that "there is sufficient reason to believe the [Saudi] distributor will be contacting your company directly in order to avoid making the purchase through [plaintiff]," and plaintiff asked for "assurance that Geri-Care will not breach the Contract," referencing language in the second letter. (Pl's Ex. 14 (DE 68-14) at 1). Plaintiff requested "timely written assurances within 7 business days of receipt." (Id. at 2). Plaintiff, however, received in that time no such assurances from the Geri-Care defendants. (See Pl's Stmt. (DE 67) ¶38). Plaintiff also received no "supply contract" from the Geri-Care defendants as Husein had requested September 9, 2015. (Pl's Ex. 31 (DE 68-31) at 1). Thus, at that point, the Geri-Care defendants' disavowal of any exclusive supply obligations to plaintiff "should reasonably [have] become apparent." Chisum, 376 N.C. at 701.

Plaintiff also argues that a "continuing violation rule" serves to postpone the running of the statute of limitations until the "violative act ceases," citing Williams v. Blue Cross Blue Shield of N.C., 357 N.C. 170, 179 (2003). (Pl's Mem. (DE 80) at 24). This rule, on its face, has no material impact under circumstances of the instant case, because the exclusivity period in the second letter extends only from September 1, 2015, to September 1, 2016. While the second letter provides for the possibility of "renew[al] on a yearly basis," there is no evidence of any such renewal. (Pl's Ex. 4 (DE 68-4)). Therefore, the latest possible "violative act" under the terms of the second letter could have taken place September 1, 2016, the last day of the exclusivity period, and more than three years prior to filing of the instant complaint. Accordingly, even assuming the "continuing violation rule" applies, it does not create a genuine issue of material fact as to statute of limitations.

---

limited nature of the contract between the parties, this is not a case of a plaintiff who has no way of knowing that the underlying breach has occurred.

In sum, that part of plaintiff's breach of contract claim based on the second letter is time barred, where plaintiff did not commence this action until over three years after the end of the exclusivity period in the second letter. Accordingly, summary judgment must be granted to the Geri-Care defendants on plaintiff's breach of contract claim, and plaintiff's motion for summary judgment on that claim thus must be denied.[10]

### iii. Lost Profits

In addition, and partly in the alternative,[11] plaintiff's claim for lost profits fails as a matter of law. Plaintiff contends it is entitled to lost profits in the amount of $501,499.02, corresponding to the profits it would have received if the Geri-Care defendants had not breached their exclusivity agreement and defendant Rakaa had proceeded with a contract for supply of calcium carbonate at $.915 per bottle, in 2015. (Pl's Stmt. (DE 67) ¶ 102). Plaintiff also asserts it is entitled to lost profits in the amount of $481,038.56 if defendant Rakaa had proceeded with a contract for supply of calcium carbonate at $.915 per bottle, in 2016. (Id. ¶ 103).

Damages for breach of contract are limited to those that "may reasonably be supposed to have been in the contemplation of the parties when the contract was made, or which will compensate the injured party for the loss which fulfillment of the contract could have prevented or the breach of it has entailed." Weyerhaeuser Co. v. Godwin Bldg. Supply Co., 292 N.C. 557, 560–61 (1977). "This measure has been held to include, in a proper case, damages for lost profits."

---

[10] Where plaintiff's breach of duty of good faith and fair dealing claim (count four) is a claim "implied in every contract," Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228 (1985), and "part and parcel" of its breach of contract claim, Liris S.A. v. Morris & Assocs., Inc., 496 F. Supp. 3d 931, 942 (E.D.N.C. 2020), that claim also must be dismissed on the same basis.

[11] The court's analysis of lost profits is only partly in the alternative to its dismissal of plaintiff's claim on the basis of statute of limitations, where plaintiff's breach of contract claim conceivably could proceed forward, but for statute of limitations, solely on the basis of nominal damages or damages apart from lost profits. Bryan Builders Supply v. Midyette, 274 N.C. 264, 271 (1968) ("[P]roof of the breach would entitle the plaintiff to nominal damages at least.").

Id. at 561. "Such damages, however, may not be awarded where the evidence permits no more than speculation." Id. "[O]rdinarily in an action for damages for a breach of contract the law will not permit mere profits, depending upon the chances of business and other contingent circumstances, and which are perhaps merely fanciful, to be considered by the jury as a part of the compensation." Id.

Accordingly, "to warrant a recovery for loss of profits in an action for breach of contract, it must be made to appear that such loss of profits was the natural and proximate, not remote, result or consequence of the breach of the contract, and such as may reasonably be supposed to have been within the contemplation of the parties when the contract was made as the probable result of its breach." Perkins v. Langdon, 237 N.C. 159, 170 (1953). To recover lost profits, it must be "reasonably certain that such profits would have been realized except for the breach of the contract [and] that such profits can be ascertained and measured with reasonable certainty. Id. at 171.

When cases refer to lost profits as "too remote and uncertain to be taken into the account in ascertaining the true measure of damages, they usually have reference to dependent and collateral engagements, entered into on the faith and in expectation of the performance of the principal contract." Wilkinson v. Dunbar, 149 N.C. 20, 62 S.E. 748, 750 (1908). In such cases, "the influence is altogether too remote and subtle to be reached by legal proof or judicial investigation." Id.

In this case, plaintiff has not established a genuine issue of material fact that lost profits were a proximate result of the asserted breach of the second letter, or that is was reasonably certain that such profits would have been realized except for the breach. To the contrary, based upon the undisputed facts, there are multiple intervening causes and contingencies upon which plaintiff's theory of profits relies. The central premise of plaintiff's claim of lost profits is that if the Geri-

23

Care defendants had maintained their commitment to make plaintiff exclusive distributor, then defendant Rakaa necessarily would have purchased Geri-Care calcium carbonate from plaintiff at plaintiff's price of $.915 per bottle. There is, however, no evidence in the record supporting the proposition that defendant Rakaa probably would have gone forward with purchasing Geri-Care calcium carbonate at plaintiff's price, rather than taking some other action, such as seeking to supply calcium carbonate from another manufacturer, or foregoing a sale of calcium carbonate at that time to the Saudi Arabian Ministry of Health.

The lack of evidence in the chain of multiple contingencies and intervening causes begins with plaintiff's reliance upon hearsay and scant documentation regarding the arrangements made between the Saudi Arabian Ministry of Health and defendant Rakaa. Early in the chronology of pertinent events, it is undisputed that "[i]n February 2015, [defendant] Rakaa notified [p]laintiff about [a] certain [request for pricing] for pharmaceuticals." (Defs' Stmt. (DE 63) ¶ 12). "One of those pharmaceuticals mentioned in the [request for pricing] was for a large quantity exceeding 84 million pills of calcium carbonate 600 mg." (Defs' Stmt. (DE 63) ¶ 13). According to Husein's testimony, that "tender" from the Saudi Arabian Ministry of Health, which is not itself in the record, did not say that the calcium carbonate must come from the Geri-Care defendants. (Pl's Dep. 66). It is thus speculative at the outset that the ultimate customer, the Saudi Arabian Ministry of Health, needed to source its calcium carbonate, with plaintiff's price constraints, from the Geri-Care defendants.

Plaintiff also relies upon a document, which plaintiff contends is defendant "Rakaa's official bid for 2015 [Saudi Arabian Ministry of Health] tender." (Pl's Ex. 10 (DE 68-10)). That document is an undated "quotation," captioned "NUPCO NPT 0001/15 Tender" that provides for sale of a quantity of 89,820,696 calcium carbonate 600 mg tablets, manufactured by Geri-Care,

24

originating in the United States, with 1,000 tablets per pack, to be supplied by defendant Rakaa at a unit price and total price in "SR," as well as a "unit price in writing," in Arabic script. (Pl's Ex. 10 (DE 68-10)). There is no evidence in the record regarding what this document means for either defendant Rakaa or Saudi Arabian Ministry of Health.

Testimony by Husein suggests, at best, that he understood an initial "offer" by Rakaa submitted to Saudi Arabian Ministry of Health "was rejected because of the pack size." (Pl's Dep.; see also DE 68-1 at 4-5 (February 2015 and April 2015 emails)). Such testimony with respect to what Rakaa then submitted, and what Saudi Arabian Ministry of Health, said in return, however, is inadmissible hearsay when offered for "the truth of the matter asserted." Fed. R. Evid. 801(c)(2). For example, Husein testifies:

> I only offered Geri-Care and they approved Geri-Care. I can't tell you if they'll approve which manufacturers. . . . Once they approve the order you have to stick to that manufacturer.
>
> Q: . . . and what proof - - what evidence you have or what document did you see that the [Saudi Arabian Ministry of Health] approved Rakaa's offer in did you say in February or March of 2015?
>
> A. No. They submitted. No. we submitted them. . . .
>
> And when they told us it was the pack size, that's when I went back to Geri-Care and negotiated the pack size and the price and resubmitted to Rakaa, and then Rakaa got the order from the [Saudi Arabian Ministry of Health] . . . . maybe early June of 2015.

(Pl's Dep. 67-68) (emphasis added). While the emphasized statements in this testimony could be admissible to show plaintiff's intent or state of mind, none of it is admissible for the truth of what defendant Rakaa and the Saudi Arabian Ministry of Health actually offered, received, or had agreed between themselves.

As such, those intervening offers and agreements constitute uncertain "chances of business and other contingent circumstances," too speculative "to be considered by the jury as a part of

[plaintiff's] compensation." Weyerhaeuser, 292 N.C. at 561. These are also "dependent and collateral engagements" that are "altogether too remote and subtle to be reached by legal proof or judicial investigation," Wilkinson, 62 S.E. at 750, and thus not a proper foundation for lost profits. Perkins, 237 N.C. at 170.

An additional layer of contingency is the ability of the Saudi Arabian Ministry of Health to choose a different distributor other than defendant Rakaa, or for defendant Rakaa to choose a different supplier other than plaintiff, independent of any exclusivity agreement between plaintiff and the Geri-Care defendants. For example, it is undisputed that "[i]n 2018, through a Saudi Arabian distributor other than Rakaa [plaintiff] won the bid for [a Saudi Arabian Ministry of Health] tender for [Geri-Care calcium carbonate] products to Saudi Arabia." (Pl's Stmt. (DE 67) ¶ 58). In addition, while plaintiff and defendant Rakaa agreed in their Memorandum of Understanding "that [plaintiff] shall not enter in any agreement or make offer to any other companies in the territory other than [defendant Rakaa]," there is no evidence that defendant Rakaa similarly agreed to use only plaintiff as its source of products, much less that it is reasonably certain defendant Rakaa would honor such an agreement. (DE 68-28 at 2).

Plaintiff's evidence regarding pricing and defendant Rakaa's obligations towards plaintiff adds further speculation and intervening circumstances precluding an award of lost profits. For example, Husein testified that plaintiff knew in September 2015 that it could not "meet [the] lower prices" demanded by defendant Rakaa, but that it "could have dropped [its] prices . . . if [it] wanted to." (Husein Dep. 156). Husein further suggests in his testimony that defendant Rakaa had agreed to a sales price with plaintiff of $.915 per bottle, but there is no admissible evidence of such an agreement. (Husein Aff. ¶ 85 (DE 68-34)). Plaintiff cites to a September 9, 2015, email where Husein states to defendant Rakaa: "After we confirmed the pack size of 60 for the same unit price,

you congratulated me on the phone that I will get this order soon and it is a done deal." (DE 68-1 at 3). However, defendant Rakaa's ability or willingness to proceed with a sales price of $.915 per bottle, regardless of plaintiff's exclusivity with Geri-Care, is speculative, where the actual sales price turned out to be Rakaa paying Health Stream LLC at $0.72 per bottle. (See Pl's Ex. 37) (DE 68-37 at 1)).

Additional intervening contingencies arise because of the terms left open by the second letter. In particular, the second letter includes no terms regarding a supply contract between plaintiff and the Geri-Care defendants, such as price of goods supplied, their packaging, advanced payment terms, or the rate of supply. There is no basis upon which to conclude with certainty what terms the parties would have agreed upon if the Geri-Care defendants had proceeded exclusively with plaintiff. As Husein testified with respect to prices with the Geri-Care defendants, "at the end of the day this is all part of negotiation," thus highlighting the uncertainties that remained after execution of the second letter. (Pl's Dep. 156). While the absence of a supply contract does not in itself foreclose the formation of the exclusivity agreement memorialized in the second letter, it is nonetheless a significant "dependent and collateral engagement[]," that renders lost profits on the basis of the exclusivity agreement too speculative. Wilkinson, 62 S.E. at 750.

In sum, the foregoing uncertainties, contingencies, and intervening circumstances preclude an award of lost profits arising from the Geri-Care defendants' breach of the first letter and second letter as asserted by plaintiff. Accordingly, the Geri-Care defendants' motion is granted in this part where it seeks dismissal of plaintiff's claim seeking an award of lost profits, and plaintiff's motion is denied for this additional reason.

b. Fraud and Intentional Misrepresentation/Concealment

In count two of the complaint, plaintiff claims that "[b]y their actions, concealments, and omissions, individually and collectively, the [Geri-Care defendants] and [defendant] Rakaa, have falsely, and fraudulently, represented and/or concealed Defendants' actions for the purpose of depriving [plaintiff] of its interests in and to the assets and value of the exclusive distributorship rights of [plaintiff] to Saudi Arabia for calcium carbonate products."  (Compl. ¶ 33).  Plaintiff suggests that the Geri-Care defendants committed fraud and intentional misrepresentation by making statements in the first letter and second letter that they "never intended to perform."  (Pl's Mem. (DE 80) at 15).  Plaintiff also suggests that they fraudulently concealed the fact that they made sales to Health Stream LLC in violation of the exclusivity agreement.  (Id. at 13).  For the following reasons, plaintiff fails to establish a genuine issue of fact supporting a fraud claim on either theory.

The elements of a claim for fraudulent misrepresentation or concealment are: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." Forbis v. Neal, 361 N.C. 519, 526-27 (2007). To be actionable, a defendant's false representation or concealment must be  "of a past or existing fact." Britt v. Britt, 320 N.C. 573, 579 (1987). "As a general rule, a mere promissory representation will not be sufficient to support an action for fraud." Johnson v. Phoenix Mut. Life Ins. Co., 300 N.C. 247, 255 (1980).  "Evidence of a promise which is not fulfilled is not sufficient to support a finding of a false representation unless the evidence shows the promisor made the promise with no intention of fulfilling it."  Britt, 320 N.C. at 579. "Mere proof of nonperformance is not sufficient to establish the necessary fraudulent intent."  Id. at 580.

28

To establish fraud on this basis, a plaintiff must "specifically allege[] the fraud—that is, the fraudulent intent—and particularize[] the acts complained of as fraudulent so that the court may judge whether they are at least prima facie of that character." Hoyle v. Bagby, 253 N.C. 778, 781, 117 S.E.2d 760 (1961). "[T]o be fraudulent the intent not to [perform] must have existed in the defendant's mind at the time he made the promise which induced the plaintiff" to act. Id. Accordingly, courts applying North Carolina law have recognized it is "unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp., 15 F.3d 327, 333 (4th Cir. 1994).

Here, plaintiff has not brought forth facts permitting a reasonable inference that the Geri-Care defendants made promises within the first letter or second letter that they had no intention of fulfilling. Rather, plaintiff highlights, at most, a difference in opinion, after execution of the first letter and the second letter, regarding the meaning of the obligations contained therein. The Geri-Care defendants' failure to perform under the first letter or second letter as plaintiff now contends was required is "[m]ere proof of nonperformance [that] is not sufficient to establish the necessary fraudulent intent." Britt, 320 N.C. at 580.

Plaintiff's argument illustrates the flaws in its theory of fraud under the circumstances of this case. For example, plaintiff contends fraudulent intent is "established by [Geri-Care vice president] Friedman's testimony that [Geri-Care] did not breach any obligation to [plaintiff] because it did not know that [Geri-Care's] product was going to Saudi Arabia; that [Geri-Care] had no obligation to [plaintiff] . . . because the representations of exclusivity were subject to a purchase order being provided by plaintiff, which obligation is nowhere stated within the [letters]."

29

(Pl's Mem. (DE 80) at 15). Such contentions miss the mark for two reasons. First, the referenced testimony post-dates execution of the purported contract by over six years, and thus does not tend to show "the promisor made the promise with no intention of fulfilling it." Britt, 320 N.C. at 579. Second, the testimony, characterized by plaintiff in its argument, establishes, at most, a difference of opinion in the meaning of the terms in the letters, such as "intended for sale in Saudi Arabia" and the "contract" referenced in the second letter. (Pl's Ex. 4 (DE 68-4)); see Friedman Aff. ¶¶ 17, 58, 71 (expressing opinion that the "letters were meaningless"). It does not show that the Geri-Care defendants had no intention of fulfilling the promise in the letters as they understood it.

Plaintiff's theory of fraudulent concealment fares no better. Plaintiff suggests fraudulent concealment on the basis of the Geri-Care defendants' "failure to communicate in good faith in any way with [plaintiff] regarding [Geri-Care] having entered into exclusivity agreements for the same product, for the same territory, with [Health Stream LLC]," and "refusing to respond to the letter from [plaintiff's] counsel in October 2015, when [plaintiff's] position with regard to its exclusivity rights was expressly stated." (Pl's Mem. (DE 80) at 16). But, nothing in the first letter or second letter required the Geri-Care defendants to provide information to plaintiff, or to respond to plaintiff in a particular way. Moreover, evidence of fraudulent intent is lacking where the Geri-Care defendants understood the obligations in the letters to be "meaningless" in the first place. (E.g., Friedman Aff. (DE 61-1) ¶ 71). Plaintiff's assertion that the Geri-Care defendants concealed their own breach of the first letter or the second letter is more "appropriately addressed by asking simply whether [that] party adequately fulfilled its contractual obligations." Strum, 15 F.3d at 333.

In sum, plaintiff has not established a genuine issue of material fact that the Geri-Care defendants "made [a] promise with no intention of fulfilling it." Britt, 320 N.C. at 579. Nor has

plaintiff shown a genuine issue of fact that they "conceal[ed] . . . a material fact . . . with intent to deceive." Forbis, 361 N.C. at 527. Accordingly, plaintiff's fraud claim fails as a matter of law and the Geri-Care defendants' motion as to this claim is granted and plaintiff's motion as to this claim is denied.

          c.     UDTPA

Where plaintiff's fraud claim fails as a matter of law, and where plaintiff's UDTPA is based upon the same alleged fraudulent misrepresentation and concealment, (see Pl's Mem. (DE 80) at 14-16), plaintiff's UDTPA also fails as a matter of law. See Winston Realty Co. v. G.H.G., Inc., 314 N.C. 90, 97 (1985). Accordingly, the Geri-Care defendants' motion as to this claim is granted and plaintiff's motion as to this claim is denied.

          d.     Constructive Fraud/Breach of Fiduciary Duty

Plaintiff claims that a "fiduciary relationship, and/or a relationship of trust and confidence, existed between" plaintiff and the Geri-Care defendants, which was violated by the actions of the Geri-Care defendants. (Compl. ¶¶ 39, 46).

"Under North Carolina law, fiduciary relationships are characterized by confidence reposed on one side, and resulting domination and influence on the other." Dreamstreet Invs., Inc. v. MidCountry Bank, 842 F.3d 825, 831 (4th Cir. 2016). "Lawyers and their clients, for instance, or trustees and their beneficiaries, share such relationships, with a heightened level of trust matched with a corresponding duty to maintain complete loyalty." Id. "By contrast, parties to a contract . . . generally do not become each other's fiduciaries; what they owe each other is defined by the terms of their contracts, with no special duty of loyalty." Id. "As a matter of law, there can be no fiduciary relationship between parties in equal bargaining positions dealing at arm's length, even though they are mutually interdependent businesses." Id.

In this case, plaintiff has not brought forth evidence establishing a genuine issue of fact that it shared a fiduciary relationship, "with a heightened level of trust," with the Geri-Care defendants. Dreamstreet Invs., 842 F.3d at 831. Instead, the plaintiff and the Geri-Care defendants are "parties to a contract" and "parties in equal bargaining positions dealing at arm's length, even though they are mutually interdependent businesses." Id. Therefore, plaintiff's claim for constructive fraud, and that part of plaintiff's claim for breach of fiduciary duty (counts three and four), must be dismissed. Accordingly, the Geri-Care defendants' motion as to these claims is granted.

e.     Tortious Interference With Contract

Plaintiff contends that the Geri-Care defendants tortiously interfered with a "contract, commencing in 2014," between plaintiff and defendant Rakaa that required defendant Rakaa "to conduct its pharmaceutical business exclusively with [plaintiff]." (Compl. ¶ 56).

A claim for tortious interference with contract has the following elements:

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

Intersal, Inc. v. Hamilton, 373 N.C. 89, 100 (2019).

Plaintiff's claim for tortious interference with contract fails because plaintiff has not brought forth evidence of a valid contract between it and defendant Rakaa "which confers upon plaintiff a contractual right against" defendant Rakaa that the Geri-Care defendants induced Rakaa "not to perform." Id. As noted previously, the Memorandum of Understanding between plaintiff and defendant Rakaa, which is the only contract between them in the record, required the parties "to respect exclusivity for the products to be supplied by [plaintiff], which means that [plaintiff] shall not enter in any agreement or make offer to any other companies in the territory other than

32

[defendant Rakaa]." (DE 68-28 at 2). It does not require defendant Rakaa to refrain from entering into agreements with suppliers other than plaintiff. As such, it does not follow that the Geri-Care defendants' breach of the exclusivity agreement in the second letter induced defendant Rakaa to not perform a contract with plaintiff.

Thus, plaintiff has not demonstrated a genuine issue of fact as to its claim of tortious interference with contract, and the Geri-Care defendants' motion as to this claim is granted. In sum, where all claims brought by plaintiff against the Geri-Care defendants must be dismissed as a matter of law, the Geri-Care defendants' motion is granted and plaintiff's motion is denied.

B.     Motion to Set Aside Default

"The court may set aside an entry of default for good cause," under Federal Rule of Civil Procedure 55(c). The United States Court of Appeals for the Fourth Circuit has "repeatedly expressed a strong preference that, as a general matter, defaults be avoided and that claims and defenses be disposed of on their merits." Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc., 616 F.3d 413, 417 (4th Cir. 2010). "When deciding whether to set aside an entry of default, a district court should consider whether the moving party has a meritorious defense, whether it acts with reasonable promptness, the personal responsibility of the defaulting party, the prejudice to the party, whether there is a history of dilatory action, and the availability of sanctions less drastic." Payne ex rel. Est. of Calzada v. Brake, 439 F.3d 198, 204–05 (4th Cir. 2006); see Lolatchy v. Arthur Murray, Inc., 816 F.2d 951, 953–54 (4th Cir. 1987) (examining whether there has been "prejudice to the plaintiff" on account of defendants' default).

Application of these factors weighs in favor setting aside entry of default under the circumstances of this case, especially in light of the Fourth Circuit's strong preference for avoiding defaults and disposing of claims and defenses on their merits. First, defendant Rakaa has presented

a meritorious defense. "[A]ll that is necessary to establish the existence of a 'meritorious defense' is a presentation or proffer of evidence, which, if believed, would permit either the Court or the jury to find for the defaulting party." United States v. Moradi, 673 F.2d 725, 727 (4th Cir. 1982). "The underlying concern is whether there is some possibility that the outcome after a full trial will be contrary to the result achieved by the default." Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp., 843 F.2d 808, 812 (4th Cir. 1988) (quoting 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2697, p. 531 (2d ed. 1983)).

In support of its motion, defendant Rakaa filed a declaration of Naif Fahad AlMalik ("AlMalik"), an employee of defendant Rakaa, in which he makes multiple assertions that provide more than the mere "possibility that the outcome after a full trial will be contrary to the result achieved by [a] default." Augusta Fiberglass Coatings, Inc., 843 F.2d at 812. For example, he asserts "[t]here was no agreement ever entered into which provided that Rakaa and the Plaintiff would deal with each other on an exclusive basis," and defendant Rakaa did not "know that Plaintiff had any exclusive agreements with Geri-Care." (AlMalik Decl. ¶¶ 10-11). He also asserts "we did not owe any fiduciary duty to the Plaintiff, nor did we make any material misrepresentations or conceal any material facts to/from the Plaintiff." (Id. ¶ 35). In addition, defendant Rakaa asserts a claim for setoff for $214,000.00 for "monies that Rakaa had provided Plaintiff for supplies which had not been provided by Plaintiff." (Id. ¶¶ 13, 36). Finally, defendant Rakaa asserts a defense of lack of personal jurisdiction and that the present action is or was barred by the prior action in Wake County Superior Court between the parties. (Id. ¶¶ 37-38). These assertions thus meet the standard of presenting a "meritorious defense." Payne, 439 F.3d at 204.

Plaintiff argues that the proffered defenses asserted by defendant Rakaa are inadequate on multiple grounds. For example, plaintiff asserts that prior claims on which defendant Rakaa asserts

setoff "were dismissed with prejudice pursuant to the findings, and order, of the Wake County Superior Court" in the prior action. (Pl's Mem. (DE 97) at 5). Plaintiff asserts that the issue of personal jurisdiction "has been determined by this Court, and conceded by Rakaa." (Id.). Plaintiff also contends that by failing to respond to requests for admissions, those are deemed admitted by defendant Rakaa.

Plaintiff's argument is unavailing, as an initial matter, because some of plaintiff's assertions are not accurate. Defendant Rakaa's claims in state court were not dismissed without prejudice, but rather they were expressly dismissed "without" prejudice by the judge that signed the dismissal order. (AlMalik Decl. (DE 94) at 46 (June 5, 2019, Order, Rakaa Medical Co., Ltd v. US Med Supplies, LLC, No. 17-CVS-9785 (Wake Cty. Sup. Ct.))). Likewise, this court did not determine the issue of personal jurisdiction over defendant Rakaa, but rather only concerning the Geri-Care defendants. See Order, Oct. 27, 2020 (DE 20) at 3-10 (analyzing the Geri-Care defendants' contacts with North Carolina). And, defendant Rakaa has not conceded the issue of personal jurisdiction.

In addition, the applicable standard is not whether plaintiff or defendant Rakaa necessarily prevails on the present showing, but rather whether defendant Rakaa has presented evidence that "if believed, would permit either the Court or the jury to find for the defaulting party." Moradi, 673 F.2d at 727. Defendant Rakaa has met this standard in asserting the lack of agreement between the parties, or knowledge of any exclusive agreements with Geri-Care. (AlMalik Decl. (DE 94) ¶¶ 10-11). Furthermore, defendant Rakaa's failure to respond to plaintiff's requests for admissions is beside the point, where counsel had not yet entered an appearance for defendant Rakaa at the time of their service, and where a "party may not seek discovery from any source before the parties

have conferred as required by Rule 26(f)." Fed. R. Civ. P. 26(d).[12] Moreover, defendant Rakaa's proposed amended responses to the same, (see DE 99-2), provide an additional basis for finding that defendant Rakaa now has presented a "meritorious defense." Payne, 439 F.3d at 204. In sum, this factor weighs strongly in favor of setting aside default.

The court turns to considering the next factor, whether defendant Rakaa has "act[ed] with reasonable promptness." Payne, 439 F.3d at 204. In this case, plaintiff filed its motion for entry of default against defendant Rakaa on March 14, 2022, before plaintiff and the Geri-Care defendants had filed their motions for summary judgment. According to the AlMalik declaration, "[w]hen received the Motion for Entry of Default in the mail, we sought out United State[s] counsel for an opinion on the legitimacy of the filings." (AlMalik Decl. (DE 94) ¶ 31). This statement is significant to this factor two reasons, each weighing on opposite sides of the scale. On the one hand, it is significant because it constitutes an admission by defendant Rakaa that it did in fact receive the motion for entry of default, which motion was filed before the instant motions for summary judgment.[13] Despite having had notice of the motion for entry of default, defendant Rakaa did not timely respond to it, and defendant Rakaa delayed over three months from its filing, after substantial summary judgment motions had been filed by the other parties and briefed fully, to file the instant motion to set aside default.

---

[12]    For this reason, the court denies as moot defendant Rakaa's motion to permit admissions to be withdrawn and/or amended. (DE 98). After defendant Rakaa has filed a responsive pleading, and the pleadings are framed as between plaintiff and defendant Rakaa, the parties and the court will have occasion to address discovery as between plaintiff and defendant Rakaa, in conjunction with determination of sanctions as set forth in more detail herein.

[13]    It is also reasonable to infer from the AlMalik declaration that defendant Rakaa in fact received all those motion papers that came after the filing of plaintiff's motion for default, as well as all the filings in this case following the court's December 16, 2020, order regarding service on defendant Rakaa. The court addresses further below defendant Rakaa's fault in failing to appear or otherwise respond prior to filing of the motion for default. The court's analysis of the instant factor focuses on defendant Rakaa's promptness in responding to that motion for default and entry of default by the clerk.

On the other hand, defendant Rakaa provides reasons for its delay in retaining counsel, and the delay once counsel was retained was minimal. It asserts "we sought out United State[s] counsel for an opinion on the legitimacy of the filings," and it was "informed that the legal filings were legitimate." (AlMalik Decl. ¶¶ 31-32). Then, it "took steps to hire counsel in North Carolina to represent us in this matter." (Id. ¶ 32). It "contacted potential North Carolina counsel in mid-May 2022 and once present counsel was retained, worked diligently with him in the filing of [the instant] Motion within a matter of days." (Id. ¶ 32).

Taking into consideration the combination of circumstances, defendant Rakaa did not act with reasonable promptness in moving to set aside default, particularly where the motion followed completed briefing on summary judgment motions. This finding, however, is tempered to a degree by the fact that defendant Rakaa is a foreign defendant and that defendant Rakaa did not unduly delay once it had secured counsel.

Relatedly, defendant Rakaa bears "personal responsibility [as] the defaulting party" for its default, and it has not sought to place blame on its present counsel. Payne, 439 F.3d at 204. It has, however, provided an explanation for its default. See Colleton Preparatory Acad., Inc., 616 F.3d at 420 (contrasting case, where default may be appropriate, where a defendant has "offered no explanation for" not responding to a complaint) (emphasis added). It asserts, for example, that service did not comply with the laws of Saudi Arabia, COVID-19 altered the proper means of service under Saudi law, the lawyers it had retained to represent it in the prior lawsuit in Wake County Superior Court had "left the case," and it disregarded notices in this case received by email because it "thought that the messages were a kind of spam or scam." (AlMalik Decl. ¶¶ 25-29). While these reasons do not detract from defendant Rakaa's personal responsibility, they are sufficient to overcome a finding that it acted in "flagrant bad faith," and will have bearing on the

court's ultimate determination of propriety of default and alternative sanctions. See Wilson v. Volkswagen of Am., Inc., 561 F.2d 494, 504–05 (4th Cir. 1977) ("[D]efault judgment should normally not be imposed so as to foreclose the merits of controversies as punishment for general misbehavior, save in that rare case where the conduct represents such flagrant bad faith and callous disregard of the party's obligation under the Rules as to warrant the sanction not simply for the purpose of preventing prejudice to the discovering party but as a necessary deterrent to others.").

The court considers next whether defendant Rakaa has a "history of dilatory action." Payne, 439 F.3d at 204. Regarding this factor, defendant Rakaa has not engaged in the instant case in any pattern of dilatory action. Its delay in the instant case is a single, albeit significant, delay in engaging counsel to enter an appearance and address the claims against it. Once counsel entered an appearance for defendant Rakaa, it has acted with dispatch. That said, in its prior related action in Wake County Superior Court, the court made findings that defendant Rakaa had "failed to coordinate with [plaintiff's] counsel the scheduling of the mediation required to be held, and has failed to coordinate with [plaintiff's] counsel the attendance of witnesses they intend to present for deposition in advance of the required mediation, as [defendant Rakaa] was ordered to do previously by [the] Court." (June 5, 2019, Order, Rakaa Medical Co., Ltd v. US Med Supplies, LLC, No. 17-CVS-9785 (Wake Cty. Sup. Ct.) at ¶¶ 16-17 (DE 94 at 45)). In addition, defendant Rakaa "failed to obtain new counsel within a period of over 6 weeks since the withdrawal of prior counsel, . . . failed to communicate with [plaintiff's] counsel in any way regarding the intentions of [defendant Rakaa] related to this matter, and . . . failed to oppose [plaintiff's] motion to dismiss." (Id. ¶ 25). As noted previously, that prior action was dismissed without prejudice for failure to prosecute. (Id. ¶ 29). In sum, although not in the instant case, defendant Rakaa does have a

history of dilatory action in the related prior action, and the court takes this into consideration in deciding the instant motion and determining appropriate alternative sanctions.

Next, the court considers the prejudice to plaintiff resulting from the default. Payne, 439 F.3d at 204–05; see Lolatchy, 816 F.2d at 953. Such prejudice in this case results from multiple categories of time and expenditures that would not have been incurred, or likely would not need to be incurred or repeated, but for the default of defendant Rakaa. In particular, such prejudice includes reasonable attorney's fees and expenses already incurred related to: 1) plaintiff's motion for entry of default and its oppositions to defendant Rakaa's instant motions; 2) mediation by the parties taking place on November 30, 2021, in which defendant Rakaa did not participate, thereby preventing full and considerate understanding by the parties of their respective positions and relative strengths and weaknesses of the claims; and 3) service of courtesy copies of discovery and filings already made upon defendant Rakaa (see Pl's Resp. Exs. 1-4 (DE 97-2 to 97-5)). Such prejudice also may include future anticipated attorney's fees and expenses that would not have been necessary if defendant Rakaa had entered an appearance when first served, such as: 1) portions of future Rule 26(f) proceedings, pleadings practice, motions practice, that are repetitive and could have been addressed in conjunction with those already completed with the Geri-Care defendants; 2) any future noticing and taking depositions by plaintiff and the Geri-Care defendants, to the extent any such depositions must be re-noticed and retaken with participation by defendant Rakaa in the case; and 3) any other identifiable litigation time and expenses anticipated to be incurred by plaintiff, which will be made more onerous, inefficient, or repetitive due to defendant Rakaa's default.

At the same time, the court is mindful that plaintiff's prejudice "may not be found from delay alone or from the fact that the defaulting party will be permitted to defend on the merits."

Colleton Preparatory Acad., Inc., 616 F.3d at 419 n. 6. "[N]o cognizable prejudice inheres in requiring a plaintiff to prove a defendant's liability, a burden every plaintiff assumes in every civil action filed in every federal court." Id. at 419. "[D]elay in and of itself does not constitute prejudice to the opposing party." Id. at 418.

Finally, the court considers all the foregoing factors together, in light of the totality of the circumstances, and the "availability of sanctions less drastic" than default judgment. Payne, 439 F.3d at 204–05; see Lolatchy, 816 F.2d at 953. While several of the aforementioned factors favor plaintiff, the presentation of defenses on the merits in this instance outweighs the other factors, when considered in conjunction with the availability of sanctions less drastic than proceeding to default judgment.

In particular, prejudice to plaintiff may be mitigated by the determination of appropriate sanctions against defendant Rakaa, as a party. The court's determination of good cause for setting aside default in this case will be subject to defendant Rakaa's liability for sanctions reasonably compensating plaintiff for such prejudice resulting from defendant Rakaa's default. While "it would be difficult if not impossible . . . to determine the precise dollar figure at which a civil sanction has accomplished its . . . purpose," United States v. Ursery, 518 U.S. 267, 284 (1996), reasonable attorney's fees and expenses may provide a rough guide for the determination of sanctions. See, e.g., Fidrych v. Marriott Int'l, Inc., 952 F.3d 124, 146 (4th Cir. 2020) (noting "the general propriety of a fee award when a default judgment is set aside"). Accordingly, the court will direct plaintiff to file a statement of attorney's fees and expenses, corresponding to the categories of time already incurred set forth above. In addition, for determination of that part of sanctions based upon future proceedings impacted by the default, it may be necessary to await final imposition of sanctions after any such further proceedings have been completed. See, e.g.,

40

id. at 145 (reviewing propriety of sanctions requested after district court set aside default and later dismissed the defaulting defendant for lack of personal jurisdiction).

In opposing setting aside of default, plaintiff cites this court's decision in Prescott v. MorGreen Solar Sols., LLC, 352 F. Supp. 3d 529 (E.D.N.C. 2018) for the proposition that denial of the instant motion is appropriate because that case involved "circumstances that appear to be far less egregious than the circumstances in this case." (Pl's Mem. (DE 97) at 9). Prescott, however, is instructively distinguishable in multiple respects. There, the defaulting defendant's "only argument concerning a meritorious defense [was] the following statement: 'Defendant has a meritorious defense, as referenced in his Answer to all claims against him.'" Prescott, 352 F.Supp.3d at 536. Furthermore, the defaulting defendant did "not dispute [the] plaintiffs' primary argument that plaintiffs were not adequately paid," under the Fair Labor Standards Act, in contrast to the assertions in the instant case concerning lack of merit of plaintiff's common law claims. Id. In addition, the defaulting defendant in Prescott had spoken with a cross-claimant about the pendency of the lawsuit, where he admitted to being aware of the lawsuit and seeking representation. Id. at 538. Moreover, the court in Prescott had already approved a settlement between the plaintiff and other defendants of class action and collective action claims, and a related defaulting defendant was "no longer in operation." Id. at 539. Finally, the defaulting defendant was a local construction subcontractor who engaged in solar panel installation in Wilson, North Carolina, and there was no dispute he was served within a month of the commencement of the suit. Id. at 535 & 539. Thus, Prescott is inapposite.

In sum, defendant Rakaa has shown good cause for setting aside default in this case, subject to defendant Rakaa's liability for sanctions compensating plaintiff for defendant Rakaa's default, as outlined herein. The amount of such sanctions shall be determined through further proceedings

as set forth below. Therefore, defendant Rakaa's motion to set aside default is granted and defendant Rakaa's motion to permit admissions to be withdrawn and/or amended will be terminated as moot.

## CONCLUSION

Based on the foregoing, the Geri-Care defendants' motion for summary judgment (DE 61) is GRANTED, and plaintiff's motion for summary judgment (DE 65) is DENIED. The motion to set aside default by defendant Rakaa (DE 93) is GRANTED, subject to defendant Rakaa's liability for sanctions to be determined through further proceedings as follows. Plaintiff is DIRECTED to file within 21 days of the date of this order a statement of attorney's fees and expenses, corresponding to the categories of time already incurred set forth herein, supported by detailed attorney time entries. Defendant Rakaa is DIRECTED to file a response, if any, to plaintiff's statement within 14 days thereof, and plaintiff may file a reply, if any, within 7 days of the response. Thereupon, the court will make such further order as is warranted regarding determination of sanctions. In the meantime, defendant Rakaa is DIRECTED to file a responsive pleading within 14 days of the date of this order. The clerk is DIRECTED to terminate as moot defendant Rakaa's motion to permit admissions to be withdrawn (DE 98).

SO ORDERED, this the 23rd day of February, 2023.

_____
LOUISE W. FLANAGAN
United States District Judge